and his capacity as Secretary of the Interior at Ell. Mr. Citrin for the appellants, Mr. Gray for the appellees, and Mr. Robinson for the intervener. May it please the court. NEPA makes clear that at some point the BLM must account for the cumulative contributions of the entire federal coal management program to global warming and consider programmatic alternatives as part of that accounting. But to date, BLM has dodged that duty with a shell game that waffles between two contradictory positions. When plaintiffs challenge individual lease EISs, as in Wild Earth Guardians, BLM argues successfully in this court that it does not have to consider programmatic alternatives as part of that challenge because the no action alternative is just canceling that one lease and there's no way to connect just one small lease to a phenomenon like climate change. But when we challenge the failure to update the program EIS, where the agency called for climate change research in 1979 and promised an update, the agency says we should be challenging an individual lease. The court should ensure that BLM's NEPA obligations are not in this way indefinitely deferred. Now on the first half of that proposition, so that's the Wild Earth decision you're relying on? That's right. But in your reply brief, you went to some length to explain why Wild Earth didn't foreclose a programmatic challenge. Right, I don't think that the court in Wild Earth Guardians held that a programmatic challenge wouldn't prevail, but I will say BLM took the position in Wild Earth Guardians that it has no obligation in individual leases to account for program level alternatives, program level effects, cumulative effects, particularly on this analysis of alternatives because they say the baseline position is all the emissions that would happen anyway and then just analyze the contribution of this lease. And I'll just point the court to where in their brief they took this position. And that was in the brief before us? Yes, that's right. The brief before this court says, this is on page 28, the status quo here for purposes of climate change is the total coal production and coal demand projected in the absence of this West Antelope II lease. That's the baseline BLM used in its ROD. And it's therefore unnecessary for BLM to calculate the precise greenhouse gas emissions that would result from burning West Antelope coal or to estimate specific climatological effects because the record indicated that its leasing decision would have little influence on those environmental impacts. So the agency's position on what it does in the individual lease EISs is perfectly clear and it is not what we are asking for here and what NEPA requires, which is some program level consideration of the cumulative impacts from the entire coal management program and I think most importantly some consideration of program level alternatives of the kind that the agency itself proposed to study when Secretary Jewell issued her moratorium and began the process of undertaking a PEIS. So that language might be open to some interpretation, but let's just assume that it's properly interpreted in the way that you do, the language in the brief. But I take it that you don't take the position that Wild Earth treated with that aspect of the arguments put forward by BLM and foreclosed somebody from arguing in a future case involving a site-specific application and approval that the kind of analysis that you think needs to be conducted now under the, as a kind of omnibus global challenge is better raised in connection with a site-specific one. I think my frank answer is that it's a little bit unclear. What happened is in the opening brief in Wild Earth Guardians the issue was only standing because that was the way that issue was disposed of. The government came back and took this position. The reply brief is a little bit unclear as to what kind of cumulative effects analysis they seem to be arguing for and then the court's holding seems to accept the government's argument but isn't clear about, you know, if your cumulative effects argument was that you had to account for the entire program, that you couldn't do that in the context of an individual EIS. I do think that agency's position on that is clear, which is that it's not going to do this in the context of individual leases because it can't be done in the context of individual leases. Why didn't you petition for rulemaking? We don't think that we had to petition for rulemaking and if we did ask for a particular rule, I think the agency probably would have denied it and then fonzied our request that has found no significant impact because they weren't going to make any changes. And it's not like the agency has, in the context of every rule change, seen that there was some triggering obligation to update the program EIS at that point. Last, shortly before the administration changed, Honor had gotten, Honor is the Office of Natural Resource something, recovery, revenue recovery, something like that, and it had a rule that was changing the fair market valuation criteria for these leases. They did not propose to do an update to the program EIS as part of that rulemaking, and in fact they categorically excluded those kinds of rulemakings from NEPA obligations. And so the agency has not taken the position, in fact, that making some effort to change the regulations is going to trigger their obligation to update the PEIS. Are you saying that, in your view, the agency takes the position that what you're seeking to get cannot be affected in a rulemaking? My understanding is that the agency is not going to update the PEIS to account for climate change because its view is that it doesn't have an obligation to do that. But if you petitioned for rulemaking, you prevail on the merits, you could achieve that result. Is that right? I don't think that's right. I mean, I'm not certain about it. That's what I'm asking. Why do you think that's wrong? I think that what would have to happen is that the agency would have to be considering making a change, and then it would determine for purposes of NEPA whether that change had any significant environmental impact. And if it's not going to make the change we asked for, it's not going to do a NEPA analysis. I don't think we have a gateway where we say, please make this rule change, essentially a random rule change, or please change the rules to prohibit all federal coal leasing, and then they would have an obligation to do a fresh NEPA. Would a rule request need to affect a change in the existing program? We could make such a request, but I don't think that they would have a triggering NEPA obligation. I realize this is a question as to whether the agency is going to respond in the way you wish, but at least you'd have a review of their response. It's deferential, but you're saying powerfully that climate change is a significant issue. They've never accounted for it, and the request for rulemaking would be, you've got to account for this in your existing program. I don't know how an answer could possibly be, well, we're not considering an individual license at this time, so we're not going to consider it. That's not an answer. I think I understand your question. Let me break it into two possibilities so that I make sure I cover your question. We could have asked the agency, please do this update, essentially file the petition just to do the update. That's an exhaustion requirement. The agency hasn't argued exhaustion, so we don't have an exhaustion problem here, and there's no question about letting them do that. I don't think the question is one of whether this challenge is properly perfected. The question is whether you could, and it doesn't even have to be you, whether one could raise a different type of challenge, goes to the agency and says, we think you need to change your program. We're petitioning for a rulemaking to change your program. And then one of your responses, it sounds like, to Judge Edwards was, well, the agency's just going to say no. And, yeah, that may be true, but then that doesn't mean that they're right to say no. That gets judicial review, and on review, the court would have to make the determination whether it was appropriate to deny the petition for programmatic change that, by hypothesis, has been brought. Oh, that's for sure right. You could ask for changes on the merits to the program policy, and you could obtain APA review of the reasonableness of the decision. What we're not going to get, though, is what we're actually seeking, which is the NEPA analysis. Because if they don't make a change, if they don't propose to make a change in response to the rulemaking, they will say there's no significant environmental impact. Sure, but if they were wrong to not make the change, then the change would have to come about, and a necessary adjunct to the change is the NEPA analysis that you're asking for. Yeah, I think the problem there is that it's going to put the cart before the horse for our purposes. I don't think we need to justify or obtain successful APA review of the failure to make a change before the agency's obligation to do the NEPA analysis is triggered. But that's true if you win in this case. I think that is your argument in this case with the NEPA analysis, that the program itself is an ongoing one, as to which there has been sufficient new information that would require a new NEPA analysis. That's your argument in this case, and that's understood. I thought what Judge Edwards was asking was, it's not as if that argument by hypothesis were to be rejected, that there would be no practical resolution at the end of the day, because there's still the practical possibility that a challenge is brought on the merits, and that says, as a programmatic matter, we're petitioning for a change in the program. And then that would get judicial review. The hypothesized denial of that would beget judicial review. So I think we're all in agreement, but I'm just going to try again to make sure. I do think that would be susceptible of judicial review, but it wouldn't necessarily create any pathway for a NEPA challenge, because the premise question is going to be whether they had some obligation to make a change to the program. And absent that, I think they'd have a successful argument that there was no environmental impact from their failure, from their denial of making a change, and so there was no NEPA obligation. I think what we're concerned with is the preexisting obligation under NEPA to account, in the course of making decisions like that, whether to institute rulemaking, whether to update the program. I was reviewing their 2019 budget justifications. They asked to double the budget for the coal management program to expedite leasing activity. In the course of making decisions like that, there is the need in implementing the program to update that stale PEIS analysis so that it can be informed by environmental considerations and programmatic alternatives. That's what's going to be absent. And while we could certainly get a sort of merits challenge, that's another step removed from where we are right now. We're just trying to get the agency to account for us, what it thinks the programmatic effects of our coal leasing. Now, with respect to the challenge that you have brought, as opposed to one that you or somebody else might bring, so what's the submission that you have on distinguishing southern Utah? And in particular, one way to think about it conceptually is that that involved a plan. A plan sets forth a framework under which implementation is going to occur and subsequent actions are going to occur. Now, this involves a program, and a program establishes a framework under which subsequent actions are going to occur. Just as adoption of the plan was deemed to be the relevant federal action in southern Utah or SUA, whatever you all in the know call it, in this case, the same thing. Adoption of the program is the relevant action. SUA is not very clear about exactly why it makes this decision, but I think on the one criteria that it does point to, this case is actually its opposite. The court seems to be very concerned with the fact that there was a regulation in that case defining the land use plan as the sole major federal action and so expecting that NEPA review would happen at the time that the plan was issued. Here, the agency told us, in fact, the opposite, that there was going to be an ongoing program subject to an update requirement for the PEIS that it was issuing when it undertook to issue the regulations in the first instance. And that makes sense. I'm sorry. There's a practical reason that that makes sense, which is that land use plans under the forest program and really under almost all other programs are periodically updated. So you get a land use plan every 10 years or you get an oil and gas management plan every five years for like the Gulf of Mexico. And so that creates this punctuated moment at which you'll get a plan level review and then you have individual decisions underneath it. It's sort of what happened in Mayo with the hunting, the 15-year plan. It's a discrete plan of a certain length. That's by nature true of plans? Is it finite in duration? In most circumstances, that is by nature true of the plans. It's just set in motion in 1979. The agency identifies and acknowledges an obligation to update its program level EIS as conditions change. Is there just no such thing as a plan that continues in perpetuity until amended in the way that this program does? I think there might be examples of it. They're just not familiar, which is why I don't think you see cases like this. Most cases like SUA involve these plans with natural punctuated moments. But do you think that if another case comes along that involves a plan that's more like this program, at least with respect to its duration, that SUA wouldn't apply? I think it wouldn't apply insofar as there was continuing action. I just want to make one point in that regard, which is that there is a definition of action in the CEQ regulations, and it says actions include new and continuing activities, including projects and programs, entirely or partly financed, assisted, conducted, or regulated by federal agencies. That definition just captures this example by its terms. So you have the opposite situation again from SUA where there was a regulatory definition of the major federal action that was limited to the promulgation of the land use plan. If I can, I'll reserve the balance of my time for rebuttal. Sure. Thank you. May it please the Court, my name is Michael Gray. I'm here on behalf of the Department of the Interior. As a threshold matter, there's a failure here by the plaintiffs to challenge any final agency action. The claim that they bring is a freestanding NEPA claim, where they contend that there's a failure to act that's reviewable under the Administrative Procedure Act because Interior has failed to supplement an EIS that was prepared in 1979. But they do not allege any substantive challenge to the regulations that that EIS was prepared for. I'm having a little trouble understanding why that argument just doesn't collapse into the merits question because their argument is that this is a Marsh case, and therefore the action's continuing. And if the action's continuing, then there is review. Your argument is that it's not. But it seems like before we answer the question that you started with, you have to ask what's the nature of the underlying federal action at issue. And then that's going to tell us whether it's something that we should review. I don't think that's particularly right because the complaint, that might be correct if the complaint here had challenged substantively the program and said the ongoing actions are in the program. But the complaint doesn't do that. The complaint doesn't identify any substantive action that is challenging. In fact, in the reply brief, they were very clear that what they're seeking is to compel the supplemental EIS only without challenging any action. In Marsh, of course, the dam at issue was construction had begun and construction was ongoing. But in Marsh, the complaint identified the record of decision for the dam as what it was challenging and said that the dam is no longer an arbitrary capricious to keep forward with the dam because you need to supplement to take into account the new information. What's missing here is any challenge to the regulation or any aspect of the program. And so they run headlong into this court's cases like public citizen and the foundation of economic trends which say that standing alone, the failure to prepare an EIS is not reviewable agency action under the APA. Aren't they necessarily just challenging the program as the action in the same way that the dam project was the challenge in Marsh? And then there's a question of whether they win on that because there's a question of whether that action that's being challenged is an ongoing one. No, I don't think that's correct because the court would not issue a decision here saying that the program was arbitrary and capricious because it was not subject to the challenge. So the court in Marsh, if it had concluded that a supplemental environmental impact statement was necessary, would issue a decision saying that the decision to go forward with the dam is arbitrary and capricious until you prepare a supplemental environmental impact statement to support it. You seem to be assuming incorrectly that under the APA a failure to act is not a viable action. That's wrong. No, I'm not assuming that at all. Under the circumstances here, given the program and the nature of the program and the promises that have been made in the program and the regulations, there's a requirement that you act when there are new circumstances of the sort that they're presenting. They don't have to show that you did something which they are now challenging. They're saying that you failed to do something which they're challenging, and that is absolutely vile. The question is whether they're right on the merits here. I don't think that's correct. What's not correct? I agree with you, but I don't think that's what this case is. I agree with you that a failure to act is certainly an action that you can bring under the APA. But the failure to act has to be a discrete action that would be a reviewable final agency action if it were taken. And what they're alleging here is a failure. Your notion of finality, respectfully, is completely off. Connecting this to 704 makes no sense, respectfully. So your argument there, I would tell you to put it in the wastebasket because it's not useful, and it completely misses the point. The point here is it's a claim of failure to act. It's not about a finality notion. It's a 706-1 notion, failure to act. There are different causes of action under the APA. You've got it wrong to suggest this has to be tied to 704. That's simply wrong. The cases don't support that. I would respectfully disagree, and this is the position that we— I'm trying to help you to make a clearer argument that gets rid of the 704 argument. The 704 argument is not going to win. I'm going to leave it alone for now. But I will say that this is the argument that we also made in the Southern Utah Wilderness Alliance case, which the Supreme Court didn't reach but noted that it didn't need to and reached the other argument. So I will move on to the argument under the regulations here that no supplement is required. I hope the Court will reexamine our submission on that point and perhaps— Don't hold your breath. I understand. Of course, under the regulations, there has to be a proposed action before there is a supplement required. The action here was the promulgation of the regulations in 1979. Unlike in Marsh where you have a project, the typical supplemental environmental impact statement is going to be required where there's an ongoing project.  The passage of a regulation, on the other hand, concludes the agency's action with respect to the regulation just as in the Sula case. The difficulty I'm having with this argument, and I don't know that it's actually limited to either side, is that you're definitely right if the action is the promulgation of the regulation. Then it follows, as the night follows the day, that that action is done. But that's just a conclusion, it seems like. If the action is the promulgation and operation of a program, that program continues to exist. So the question for us is, which descriptive framework is the correct one? I think regulations are more like the land use management plan that was at issue in Sula because they're really the prototypical agency action. That's what you're studying, the passage of the regulations. Then when you pass them, it's done. Of course, here the regulations themselves then provide for additional NEPA review at each stage of the process. So you'll have NEPA review at the land use management plan stage under the flip line. Then you'll have NEPA review at each individual stage. So the obligation was for the regulations. Otherwise, you would have a continuing duty to supplement for any regulatory regime any time there's new environmental information, which I think would be unworkable. So let me ask you this question that borrows from the way that you've characterized it. So if it's true that the relevant action is promulgation of the regulations, which establishes a framework that's then implemented on an ongoing basis, if we conceive of the action in the way that you want us to conceive of it, and I'm not saying we would, I'm just saying as a matter of argument, suppose we do, then it seems like you have to take the bitter with the sweet, which is that if the only thing at issue is the establishment of the framework and then that framework is visited on an ongoing basis in the form of projects that are approved, then the assumptions that underlay that framework are incorporated into every act of implementation. And so then it can't be that there was an obligation to do a programmatic EIS at the beginning in connection with the establishment of the framework, but then that's done. And then every time it's implemented, you don't ever have to look at the programmatic implications that were at issue with respect to the establishment of the framework, because whatever environmental impacts are associated with the establishment of the framework are practically implemented on an ongoing basis, so that on a site-specific application, those kind of global national impacts are something that should be taken into account. Do you see what I'm saying, what I'm saying? No, I understand what you're saying, and I don't think I disagree with it. I'm trying to, you know, yes, when you have a programmatic environmental impact statement like here, of course NEPA's aims are to inform the agency and to inform the public of the impacts procedurally so they can make an informed decision. So when you have a situation like this where you have a programmatic environmental impact statement for a regulatory regime and then projects that go forward individually under it that have their own environmental impact statements or environmental assessments, then the question is, you know, for each of those, they can rely to some extent, to no extent, on the programmatic statement depending on what impacts are at issue in those statements. But under those circumstances, if there's a deficiency in the programmatic on a particular point, it's within the agency's discretion, just as it always is, whether to prepare a programmatic environmental impact statement at all to begin with, whether to address that deficiency through a supplement to the programmatic or through the individual. The question is whether there's an obligation to do it. I mean, it seems to me the government, both in 79 and 82, made it clear you understood there was an obligation. Even in 82, when you took the language out, you said the department must revise or update the program EIS when its assumption, analyses, and conclusions are no longer valid. That's what this is about. And the question is, is that enough for them to be able to bring the claimant there? And not be limited to the individual licensing situation where it's clear you're not going to do anything. You've made that clear. You're not going to look at the larger environmental concerns, climate change that they're talking about, and you're not disagreeing with them that there have been major climate change. I don't think that that statement from 1982 is enough because it did come in the context of repealing the regulation governing when an agency would update the programmatic EIS and is coupled with a statement that essentially the agency will do what NEPA requires when it requires it. So it just collapses down into the question. Well, do you agree with their starting premise that there's major climate change? And you have said that you understand. In 82, you say you don't even need the language. We understand we must revise or update the program EIS when the assumption, analyses, and conclusions are no longer valid. How is that? I would say two things about that. One, that statement was made, of course, before most of the major NEPA cases, including Southern Utah Wilderness Alliance, and I don't think the agency's view of NEPA there can bind it now in light of the understanding of NEPA from those cases. But also as a practical matter, that regulation in that statement was, of course, pertained to the regional leasing system, which has now been abandoned. And the regulations for the leasing by application system, which is how the agency does it now, contemplates individual environmental impact statements. So you're saying the government's position is there is no obligation to revise or update a program EIS when everyone can see that the underlying assumptions are wrong? The obligation – That's the government's position. Take it the way I've given it to you, please. Everyone in the room would agree that the underlying assumptions are wrong. Is the government's position that, nonetheless, we do not have an obligation to review an existing program that's resting on incorrect assumptions? I will say yes with the caveat that the obligation to examine environmental impacts of actions taken under the program arises with respect to individual actions taken under the program. Individual actions governed, guided by, affected by the program statement? At this point, the individual actions, the environmental impacts – Let me – please, if you just answer my question, then I would understand your position better. Are the individual actions governed by, guided by, influenced by the program that is still on the books? Yes or no? They are guided by the regulations. Are they guided by – They are not guided by the impact statement. Please do me a favor, since I'm the one – one of the ones who has to go back and think about it afterwards. Just answer my question, then you can amplify. Are they governed by, regulated, affected by the program statement that is still on the books? Not the program statement generally. What the EISs do, the individual EISs do, is they generally recite that the program statement exists, but the agency is not tiering to that for any purpose, climate change or any other purpose, generally in its individual statements now. The individual statements stand or fall on their own. And this court has said – The program EIS is of no consequence is what you're saying? The program EIS was for the 1979 regulations, which were promulgated in 1979 and completed then. The program that – But every action on a going forward basis is necessary. I mean, it just – If they want to – It just seems to me you're not taking the bitter with the sweet. Right. Because if you establish a framework and you view the action as just the establishment of that framework, you might be okay. But if that framework governs ongoing action, then every time there's an implementation of that action, it's necessarily under the auspices of that framework. And so it seems anomalous to say that establishment of the framework is done and over with. And every implementation decision, we're going to treat it as if it's this hermetically sealed application that has nothing to do with the overarching framework. No. Nothing that has nothing – Which is getting at is that that framework, it does inform and guide every implementation. Perhaps I'm not being clear. The regulations clearly inform and guide. The impact statement was prepared for those regulations. But when you're dealing with environmental impacts and informing, making an individual decision, you have to look at the environmental impacts, including cumulative impacts. And so if they want to challenge an individual decision and say that the cumulative impacts have not been sufficiently considered in that decision because the agency's programmatic EIS is out of date and needs to be updated, they can bring that challenge. But that is not this case. But before you stop that, so that's a critical point. Because I think the submission that's being made on the other side is if somebody were to bring that kind of challenge in connection with a site-specific one, the answer from the agency would be no, you can't bring that type of challenge here because the programmatic EIS is done and over with. All we're talking about is site-specific impacts at this point. Everything that's encompassed by the programmatic impacts, i.e. nationwide impacts, that's on the back burner. That's just not an issue in a site-specific application. It sounds to me like what you're saying is no, they're free to bring that type of claim, and that would have to be treated with. The courts would have to decide it and we would have to respond to it. We would have, I'm certain we would have defenses to it. No, no, no. You're going all over the place. You either have an obligation or not. Judge Srinivasan said you seem to just say in the individual licensing, that is when their claims about consideration of the programmatic impact statement and larger issues of climate change, that's when you have to raise it. And they can raise it then. And if they raise a legitimate claim, we have to address it. And if we fail to do so, the court will reverse you. Right? Is that what you just said? If they raise it and we have, and it's a legitimate claim, yeah, that's all correct. But, I mean, I also do not want to concede that they would necessarily win that suit. I'm sure we certainly would have defenses to it. In what way would they lose? I mean, I guess here's my question. So it may well be that somebody who brings that type of challenge loses because anybody can lose any case if the particular arguments in that case are wrong. And so, obviously, you can't take the position of the government that somebody's going to win. I guess my question is, if they make this type of argument that says, suppose we rule in this case the way you want us to rule. Just suppose it. And then the site-specific application comes along later. And what the challenger basically does is to say, yeah, that case that the D.C. Circuit decided only resolved that the regulations, the promulgation of the regulations was the relevant action. In this case, what we're saying is that framework that was established is being applied here. That framework needs to be rethought because there's a bunch of information that underlay the establishment of that framework that's just no longer good in light of current knowledge. Would the government respond and say, that's not an argument that we have to deal with in a site-specific one. That's all we have to deal with in this case is site-specific impacts. This kind of global nationwide impact is just off the books. It's done and over with. Or would the government say, no, you can make that kind of argument, and we'd have to defend it by saying that what we have on the books now is good enough. I'm not sure I'm comfortable making a representation about, you know, the specific defenses that the government would make in that kind of suit. I do think that procedurally that's the proper way to bring the suit. And I think that here, where they're not challenging any particular substantive action, where the agency hasn't proposed to take any new action or regulation, what this really amounts to is an attempt to get at the program through the procedure of NEPA, when we know from cases like Lujan and from SUA that you can't get substantively at the program as a whole by bringing a substantive challenge. And so what this really amounts to is an attempt to get at that sort of programmatic improvement, overall improvement of the program through NEPA. They can get at it if there's an obligation, if they're correct in their claims with respect to obligations, that can be found. You just disagree on that. That's all. Don't say it's not possible. It is possible. The source of our disagreement is that there's no obligation here. But that's, I mean, let's be clear about that. This is of a piece of SUA, Lujan, those sorts of cases where plaintiffs come in and seek programmatic improvements. And the courts, the Supreme Court, this Court, have said over and over again, you can't seek those sorts of programmatic improvements through litigation. It's truly against the program. You must proceed in a case-by-case basis, even though it's not necessarily preferred by plaintiffs. So if that's the route, then I take it that if your response to this suit is you can't bring this type of programmatic challenge in this case because there's a bunch of cases that establish that proposition, the correct vehicle is to wait for an as-applied, let's just call it as-applied, like a site-specific application. Then when the site-specific application occurs, then you wouldn't be able to say, those same cases also say you can't bring that type of challenge in a site-specific application. That wouldn't be the answer. I think that probably wouldn't be the answer, but I'm sure there are other answers that we would have to that suit. Yeah, you can't, I wouldn't expect you to concede defeat. That's yet to happen. But in terms of the position that you would take, it would have to be a different response. It couldn't be that type of programmatic challenge is just not cognizable in this kind of action. I think that's probably right. I think what we would say is it clearly fails on the merits because of the nature of individual EISs and whatever we did there. What do you mean by that? That seems important. What do you mean by that, that it would necessarily fail? How can it be the case that, on one hand, you're saying now you have to go through an individualized action, and then the answer to the individualized action is it necessarily fails in an individualized action? I think the fact that they would lose both cases doesn't mean that they get to bring this one. Sure, they can lose both cases. That's all I'm trying to get at here. So you're not saying that the government's position is not that this type of programmatic challenge can't be brought in this type of action. The proper way to bring it is an individualized action. And then the answer to the individualized action is you can't bring that kind of programmatic action in an individualized case. Right. No, I mean, I think like in Ohio Forestry, I mean, that case is similar, right, in that the court there said you don't challenge at this level. That was rightness, but you wait, and then you can get at the plan through the individual action. If there's a deficiency in the – I think there's a forest plan there, right? If there's a deficiency in the forest plan that informs the individual action, you can get at it through the suit when there's an individual action. Right, so if there's a deficiency in the program, you can get at it in the individual action. I think that's the form to bring it. through a freestanding NEPA claim where there's, you know, no action challenged and they're going after the program as a whole and the agency hasn't proposed to take any action, which, of course, is supplement. The question when you're doing a supplement is, you know, what are the alternatives? What should the agency do? Well, if the agency hasn't done anything, you don't do a supplemental EIS to possibly inform some potential future action. They want us to change the program. Well, how? Bring a petition. Tell us how you want us to change it. Then we can study the alternatives to changing it. You don't just bring an EIS and say, well, the impacts are not known, so now we have to go update all of the impacts, and then maybe you'll change the program in some way. What do you mean just bring a petition? In the way that this court was suggesting earlier, you bring a petition for rulemaking. Oh, but there's two – well, I don't mean to cut you off. Go ahead. Well, there's two different – let's suppose that the question is, what alternatives are there to raise this sort of issue with the agency? It seems to me there's two potential ones on the table. One is you bring a petition in terms of asking for agency action to adjust the underlying program. We did talk about that. But another is that you bring this form of challenge in part as a challenge to the approval of a site-specific project. I agree, and this is neither one of those. Yeah, this is neither one of them. But you're not – are you suggesting that the only way to do it is through a petition for agency action, or are you saying – I'm saying that either of those two alternatives would be available to the plaintiffs here to get judicial review of inadequacies in the – In the national – Right, yes. Can I ask you a somewhat technical question maybe that maybe I can get your help on, which is the way that tiering intersects with the issues in this case. So that's only the second type of challenge, the site-specific application. So with respect to that, if the programmatic EIS were tiered in the agency's response to a specific lease application, then as I understand it, tiering basically means incorporate by reference essentially, is that we're taking everything that underlays the thing that we're tiering and we're depositing it into this. Is that at a high level generality? Yeah, I think – yes. So if that's true, then the programmatic EIS, when it's tiered, essentially becomes at least part of the EIS. And in that situation, a challenger could just say, well, look, the programmatic EIS is just before us with respect to this site-specific application. How do we know? Because it's tiered, and so it's here. Yes. So it sounds like on the ground that tiering is not happening. And then if that's true, then would the government take the position that basically we get the choice not to bring the programmatic EIS into play because we're not tiering? And then because we're not tiering, you can't bring a challenge that affects the programmatic EIS. I think that's probably right, but in that circumstance, then the individual EIS has to stand on its own. You don't get the benefit of the tiering. So if they then challenge the individualized EIS and say, well, you haven't considered programmatic impacts, we wouldn't be able to rely if we haven't tiered formally to that document on that document to provide the programmatic impacts. And then the question would be whether they could prevail on a suit saying you had to do the programmatic impacts at the individual stage. And that's where that question should be answered, not here. And the answer wouldn't be simply by virtue of the fact that we're not tiering, that challenge is foreclosed. The answer could still be, no, we can't get out of an obligation we have by not tiering. To the extent the obligation exists, yeah, you cannot get out of it by not tiering. We may contend in that suit that the obligation didn't exist, or I don't want to foreclose any arguments the government might make in some future suit here, but that should be resolved in that suit. Thank you. Thank you. Thank you. May it please the Court, my name is Michael Robinson. I represent the intervener, State of Wyoming. We approached this in a slightly different manner by looking at what the plaintiffs were asking for. They were asking for a supplement of the 1975 Environmental Impact Statement. That statement considered a national coal program. If you go back and actually look at what that statement evaluated, was what eventually became the regional coal production process. There's no discussion of the individual lease-buy application other than to note it was a possible alternative. But all the environmental evaluations and impacts related to that national program. That program was initially implemented through the 1979 regulations, and it lasted barely a decade because it was completely ineffective. All those coal regions have been decertified. Would you say completely ineffective? Yes. All those regions have been decertified. So the program, the 1979 EIS looked at, no longer exists. That framework is gone. Now, they still exist on the rules. The 85 program doesn't exist. Yes, the 1979 program was established by that Environmental Impact Statement no longer. Leading to the 85. And supplemented by the 85, yes. When you say they don't exist, what does that mean? It means that they are no longer used. The process of setting coal leases through designated regions based upon national production goals, that no longer exists. So you're saying in the individual licensing action, your view is that those programs have no impact whatsoever. Is that your view? No, not necessarily. I'm not sure I'm following. I'm not sure what you're saying when you say the program doesn't exist anymore. It's either a framework or it's not. Right. See, in 1979, Environmental Impact Statement evaluated a program whereby regions were established, basically like little councils. There would be a national production goal, and they would set sales and leasing goals. Right. All those regions have been decertified. Okay. The only thing left is the individual lease by application. That now covers all coal leasing on federal lands. But is there something in the program that has an impact on the individual licensing request? Not that I'm aware of, because each individual one has its own Environmental Impact Statement. I guess what I'm not understanding just conceptually about your argument is you'd be right if the only thing that was established in 1979, 82, or 85, whatever we're talking about, that complex of years, was the regional part of it. Yeah, that's true. But there's a lease by application part of it that was also established then, and that continues to exist. It sounds to me like you're agreeing that that continues to exist because leases are happening and they're being considered. Right. What the 1979 Environmental Impact Statement said was, here's the program, and then there may be some other alternative ways to supplement that program, but we're not going to evaluate them. So you just understand the programmatic EIS only to be dealing with the regional aspect of what was established, which doesn't have, in your view, it has nothing to do with lease by application. Nothing to do with them other than establishing the fact that they exist. Other than saying- It seems like a pretty big other than. Yes. I mean, if that's what establishes they exist, then that's the EIS that evaluates. Right. Well, they were established through the 1979 regulations, which first set out the regions, coal-producing regions, and then said, okay, for anything that's not in a coal-producing region, you can do this lease by application. With the one slight exception, if there was an emergency in a region, you could use that. To my knowledge, that was never used. Once all the regions were decertified, by definition, you could use the lease by application anywhere. Okay. Thank you. Thank you, Your Honor. And is there any time left for- One minute. Okay. We'll give you three minutes. Thank you. Just a couple of quick things. We agree that the case does boil down to whether or not this is a Marsh-type situation. And just note that the distinction that was offered between this case and Marsh is just not correct. The plaintiffs in Marsh were seeking from the court an injunction against the continued building of the dam from the court until the NEPA analysis was done. They weren't saying, substantively, you can't build this dam. It's arbitrary and capricious to build it, period. They were saying, until you do the NEPA analysis, you can't build it. That's the exact thing that we are asking for here. If you look at paragraph C of our relief provision in our complaint, it's a JA85. You'll see we're asking for an injunction against any continued management of the program until the NEPA analysis is done. I mean, the problem for you or the question for you is whether the Marsh situation appears here, that is an ongoing obligation that was pretty clear from the program that we're talking about there, and whether you have that here. Yes, I agree. That's right. There's no question that if you have the right circumstances, you can bring a claim for failure to act. I mean, not that there is any doubt about that, but the question is whether you're within the Marsh frame or whether you're in the Titan-Ordon frame. We can't show it. I agree with that. I was just addressing the only distinction that I heard the other side offer. I will say, from our view, the way to resolve the question of whether this is an ongoing program of the Marsh form is, first and foremost, the definition of action that appears in the CEQ regulations. I think that's at 40 CFR 1508A. That's actions include new and continuing activities, including projects and programs, entirely or partly financed, assisted, conducted, or regulated by a federal agency. And in this regard, there are two important aspects of the 1982 statement that you were pointing to, Judge Edwards. One of them is our freestanding APA claim that when you make a statement like that in a record of decision, you are bound by it. The other is, if this was, as the agency now submits, just the issuance of the regulations and it was concluded in 1979, there would have been no reason to suggest that the PEIS would ever be updated for any reason, because the agency's position is that these are the regulations. They've been issued. The final agency action is over. Hold on. I mean, it could be that that was before SUA, and what they were saying was, we understand this to be what's required by law in terms of when NEPA requires supplementation. And that was just, it turns out to be an intuitively, gratuitously expansive understanding of NEPA obligations, and the Supreme Court corrected that later, and now their position is, whatever we might have said about what we thought was required by NEPA before, we now stand corrected. I mean, it's before NEPA and, before SUA and Marsh, and it's not like SUA has, takes the position that it's never necessary to update a program EIS or an EIS of any kind. In fact, it reaffirms Marsh's standard that there is, in fact, an obligation to update it at certain periods. And what they're saying is, this is not a closed program. This is not over. That's all that Marsh and SUA are adding. If it is over, then you don't have to update it. If it's not over, then you do. Well, I think what they would say is, before SUA, we would have thought that just like plans set forth frameworks, programs set forth frameworks, and we thought that there was a NEPA obligation to continue to supplement with respect to a plan, no less than a program. Now we realize that with respect to a plan, actually the NEPA obligation to supplement ends at the moment that the plan is adopted. And by virtue of the same reasoning, we now get that the NEPA obligation, the supposed NEPA obligation to update ends at the time that the program is adopted. I suppose that if that's the way you want to, you would read it. And I agree it was an old statement, so it's maybe less probative. I would focus on the contemporaneous, the current regulation. So can I just ask you about this? I just want to make sure I understand the argument on the regulation. So the regulation does say actions include new and continuing activities, including projects and programs, and then et cetera, et cetera. And why does that dictate that your conception of this program is the right one? Why does that language, it includes new and continuing activities, including projects and programs, but I think I'm missing something on it. Well, I just think it makes the point that it's not limited to individual projects in the Marsh-style way. You don't have to say, you know, you just have this individual site-specific project that hasn't been concluded yet. Actions can include continuing activities like a program. And I frankly don't even think there is a dispute that this is an ongoing program. They asked to increase the budget for the coal management program by doubling it in order to do more work under the program. Secretary Zinke, when he lifted the pause, called it the Federal Coal Management Program. There is a program here. It does a ton of work. It has 25 pending lease applications. So let's just assume that that's right. Then the question becomes whether the relevant action is the ongoing continuation of that program or was the establishment of the program at the outset. Because in the same way, a plan continues to have repercussions after the plan is adopted, too. But the way the Supreme Court construed it in SUA was the relevant action was the adoption of that plan. Even though the whole nature of a plan is that it's how the priorities and principles set forth in the plan are going to be applied on an ongoing basis. That's right. But I don't think it's either or. I think it can be both. The adoption of the program can be itself an action for major federal action, and the continued operation of the program can be in some circumstances. And that's also true of a plan, right? What the circumstances. I agree. That's right. That's also true of a plan. I think a huge distinction is a land use plan doesn't have a huge amount of staff and budget and ongoing operations the way that the Federal Coal Management Program does. This is an ongoing program of the BLM. It is continuous and is in operation, which is why I don't think you see the government arguing this is not an ongoing program. They just say this program is over, essentially, or the action for purposes of NEPA is over. I'm not sure they say the program is over. Ongoing doesn't necessarily give us an answer. The fact that something is ongoing, all these things are ongoing. The question is whether there's a responsibility to update, and that's a different question. And that's really where the Norton question comes in. All these programs are ongoing of a sort. I think that's right. And that's when the hammer of Norton is big. I mean, Norton says, no, no, you've got to find a discrete obligation. You're trying to get an agency to take action that you say is improperly withheld. That's right in the Norton. And Norton gives fairly strong words about what you've got to be able to show. And you've got to show that they have an obligation somewhere to be found. The mere fact that a program is ongoing doesn't mean that anyone has promised that it's going to be updated, at least the way you want to get to it. Now, there'd be other ways to get to it, but maybe not the way you want to get to it. I agree that that's right. And I think that the reason that the regulation refers to continuing activities and the reason that SUA and Marsh both talk about major federal action remaining is to point to the question whether there's still anything the agency can do about it once it does the NEPA analysis. Does there a point to this, or is this a program that has more or less been set in motion and not going to be governed by an ongoing government? Well, the government has more or less suggested that your attack line, apart from a request for rulemaking, is in the individual site-specific claims. I seem to hear them saying that you can raise the larger concern there. I'll just say that I also seem to be hearing them say that here, although I seem to hear them say the opposite in the Wild Earth Guardians case. The other thing I just want to point out is from the intervener's brief. This is a quote to the 1979 PEIS, and it's further to your point about taking the bitter with the sweet. They say that the way that the PEIS was set up was one tier to consider inter-regional and national impacts and one to consider site-specific and cumulative intra-regional impacts. And that's exactly the way that the program is, in fact, carried out. When you look for those cumulative impact analyses in the site-specific EISs, they accumulate the amount of carbon dioxide that's being released from the Powder River Basin. They don't ever analyze the entire national impact. Right, and then the question would be whether that's right. They might be doing that as a matter of reality, but then the question would be if somebody was challenged. The question is whether that should be challenged, right. Right, all I'm saying is that what they said in place was, in fact, a program in which the PEIS is doing the national impacts work. It continues to do that, and we think that we can challenge that here. And I don't want to belabor this too long, but I do want to follow up on the Marsh, because the key to this case is who's right on which box it falls into. Is it a Marsh case or is it a SUA slash Norton slash Southern Utah case? So on that, on the Marsh piece of it, nobody would suggest that the obligation to supplement continues to exist after the construction of the dam is completed, I think. Even though the EIS that antedated the construction of the dam talked about the environmental consequences of the operation of the dam going forward for a long time after construction. So there's a finite endpoint there, even though that finite endpoint hadn't been reached. In SUA, there also was a finite endpoint. It was beforehand. It was just the adoption of the plan. Even though the plan, the whole point of a plan, is that it has continuing consequences into the future. With your assessment of the program, is there ever a finite endpoint? Or is it just that as long as the program exists, it's always subject to the potential possibility of needing to be supplemented in light of new information? If the program doesn't conclude, if it is an ongoing activity, it's not going to have a finite endpoint as such. There is still an obvious limiting principle in the requirement that the change circumstances be significant, which is exactly what motivated Judge Edwards' opinion in Mayo. Right. So there's a filter. I get that. But in terms of – I guess you want to be in the Marsh part of it. And I guess my point is simply – my observation is simply that even in Marsh, there's an endpoint. Even in Marsh, there's an endpoint, right. Whereas the argument here would be that there's just not an endpoint because – and you may or may not be right. It may be that the nature of a program of this variety, the way it interrelates with NEPA, is just that there is no endpoint. There's always a potential duty to supplement as long as it's significant. I think that's inherent in the design of NEPA. They wanted ongoing activities of the government to be conducted in light of information about the environmental consequences so long as there was something the government could do about it. The point is, once you're done building the dam, you can't do anything about it. The dam is there. You're not going to destroy it. That's true as a practical matter. You may not destroy the dam. But is it true that the government is no longer involved in the operation of the dam? And I just don't know enough about how these projects work. So for purposes of Marsh, I think you'd have a very different case if the person's complaint was, actually, there's still major federal action to be involved in how this dam is run. And if you ran it differently, it would have different environmental consequences. Please analyze those environmental alternatives. It's just they were attacking the building of the dam. Like it turns out, you know, the EIS that attended the construction of the dam hypothesized that fish would survive because of the following assumptions. It turns out those assumptions are completely wrong. No fish are surviving. You can't get to it. Right, but I think the decision that was to be taken was whether to build the dam or not. And so that decision being concluded, there would be no reason to update the EIS. Yeah, it just seems like it just becomes as question-banging as everything, because that's true. If it was building the dam, then you're right. Just like if it was just promulgating the regulations or establishing the program, then you'd be wrong here. Yeah, I guess I don't think in Marsh there's any discussion of a potential major decision for the government to stop operating the dam even though it's being constructed. I think they're taking the case as it comes to them, and all they're trying to suggest is if there isn't discretion left, if there isn't major agency action, major federal action to be undertaken, it's too late to update. And we are not, manifestly not, in that situation here. There are a lot of decisions left to be made, like the Secretary's decision  Thanks very much. Thank you, Counsel. Counsel, the case is submitted.
judges: Henderson, Srinivasan, Edwards